UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DEAN W. GALUSHA,

                              Petitioner,

        - v -                                                    9:02-CV-1602
                                                                 (DNH/GJD)
GEORGE DUNCAN,

                              Respondent.

DEAN W. GALUSHA, Petitioner pro se
G. LAWRENCE DILLON, Assistant Attorney General for Respondent

GUSTAVE J. DIBIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

David N. Hurd, United States District Judge pursuant to 28 U.S.C. § 636 and LOCAL

RULE N.D.N.Y. 72.

        Petitioner complains of a judgment of conviction, rendered in the Oneida County

Court.  Petitioner was convicted of second degree murder after a jury trial. Trial

Transcript of Dean W. Galusha, dated April 22-24, 27, & 29, 1998 ("Trial Tr.") at 994.

On June 30, 1998, Petitioner was sentenced to an indeterminate term of twenty-two (22)

years to life.  Sentencing Tr., dated June 30, 1998, at 10.   Petitioner seeks a writ of

*habeas corpus* pursuant to 28 U.S.C. § 2254 on the following grounds: 1) he was not

competent to stand trial; 2) the conviction was based on insufficient evidence; 3) the

trial judge failed to give a proper jury charge; 4) petitioner did not have effective

assistance of counsel; and 5) the sentence was excessive.  Dkt. No. 1, Pet. at ¶ 12.

Respondent has filed his answer, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 6, 7).  For following reasons, this court agrees with the respondent and will recommend denial of the petition.

## BACKGROUND

On November 21, 1997, Petitioner was indicted on two counts of second degree murder. Indictment, dated Nov. 21, 1997.  The indictment states that between the evening hours of October 4, 1997, into the morning of October 5, 1997, Petitioner choked Lamont Morales, then left him at a time and place where he was not likely to be discovered, resulting in Morales' death. *Id.*

On December 16 and 22, 1997, the trial judge conducted a pre-trial competency hearing to determine if Petitioner was competent to stand trial because two psychiatric examiners found Petitioner incompetent to stand trial. Competency Hr'g Tr., dated Dec. 16 & 22, 1997.[1]  The first witness was Dr. Dana Kordylewska.  *Id.* at A3.  Dr. Kordylewska stated she was the clinical director at Mohawk Valley Psychiatric Center, and she performed a psychiatric evaluation of Petitioner on October 27, 1997.  *Id.* at A3 & 5.  She stated that the evaluation lasted approximately forty-five minutes, and Petitioner was able to tell her about his family background.  Petitioner also told Dr. Kordylewska that he spent three years in a children's inpatient program for behavior

---

[1] The hearing was held on two days, however, the transcripts of the proceeding are not consecutively paginated from one day to the next. *See* Competency Hr'g Tr., dated Dec. 16 & 22, 1997.  Therefore, the Court will reference the December 16th transcript using the letter "A" prior to the page number and will reference the December 22nd transcript by placing the letter "B" prior to the page number.

problems, he suffered from depression, and had attempted suicide. He stated that he had

been imprisoned for three years for an assault on a police officer, but stated that he did

not remember the event. *Id.* at A7-9.

Dr. Kordylewska stated that Petitioner's responses to her questions were relevant

and rational, and he was fully oriented to time, place, and person.  He could remember

events from his past, however, he could not remember incidents when he allegedly

assaulted people.  Dr. Kordylewska stated that she could not recall if she discussed the

process of a trial with petitioner.  *Id.* at A9 & 11-13.  She testified that Petitioner could

***not*** establish a working relationship with his attorney because he could not remember

the events that occurred at the time the alleged murder took place.  *Id.* at A13-15.  She

stated, however, that Petitioner had the intelligence to listen to counsel and make

informed decisions about how to conduct his defense.  *Id.* at  A17-18.  She also noted

that any delusions Petitioner may have had would not affect his competency to stand

trial.  *Id.* at A20-21.  Nonetheless, she found him incompetent to stand trial ***only***

because he stated that he could not remember the facts surrounding the murder of Mr.

Morales.  *Id.* at A24.

On December 22, 1997, psychiatrist, Dr. Jehanger Kotwal testified.  *Id.* at  B2-3.

Dr. Kotwal's examination of Petitioner took place on November 1, 1997 and lasted for

an hour and fifteen minutes.  Petitioner was able to give background information and

coherent answers about his past; was oriented to time and place; could perceive, relate,

and recall incidents of the past; and understood the process of a trial. *Id.* at B5-10.

However, Dr. Kotwal also found that Petitioner was not competent to stand trial because, although he could make an informed decision based on the advice of counsel and understand the charges against him, he could not remember the murder. *Id.* at B9-13 & 20. Dr. Kotwal believed that Petitioner's inability to recall the events of the crime would render Petitioner unable to assist counsel in the defense of the case, making Petitioner incompetent to stand trial. *Id.*

The prosecutor argued that even though Petitioner stated that he could not remember the events leading up to Morales's death, all the relevant factors weighed in favor of finding that Petitioner was competent to stand trial. *Id.* at B23. At the end of the hearing, the trial judge found that petitioner was competent to stand trial. *Id.* at B23. The court found that the ***only*** reason that both doctors believed that Petitioner was incompetent was because he stated that he could not remember or "refused" to recall the events of the murder. *Id.* at B21. The trial judge asked defense counsel whether the defendant had been able to discuss sufficient background information for counsel to proceed with the defense. *Id.* Counsel stated that it was his "honest opinion" that counsel could proceed. *Id.* Based on all the information at the hearing, the trial judge determined that petitioner was competent to stand trial. *Id.* at B23.

The trial began on April 22, 1998. Trial Tr. at 20. Utica Police Officer Elizabeth Shanley testified that at approximately 2:11 a.m. on the morning of October 5, 1997, she received a call regarding a possible homicide. *Id.* at 279-81. Officer Shanley stated that she entered Lamont Morales's apartment and discovered his body in a closet. *Id.* at

-4-

281-83.  One end of an electrical cord was tied around his neck, and the other end of the cord was tied to a clothes rod. *Id.* at 283. There was a handcuff around the victim's right wrist. *Id.* at 284.

Dr. Charles Brady, the Oneida County Coroner testified that he went to the scene of the crime. *Id.* at 296.  He observed the cord wrapped around the victim's neck, some blood surrounding his nostrils and the corner of his mouth, horizontal marks below the Adam's apple, and a "hanging mark" under the jaw caused by the cord.  *Id.* at 296-98. The difference in the two marks indicated that there had been some strangulation prior to the hanging. *Id.* at 301.

Albert Sessomes, Jr., a tenant in the apartment building, testified that he had known Lamont Morales for approximately one month, and that Morales was his roommate for a short time until Morales moved into an apartment upstairs. *Id.* at 355-56.  Sessomes then described how Petitioner had also been his roommate for a few days, but Sessomes asked Petitioner to move out because Petitioner created a problem with Sessomes's guests. *Id.* at 357.  Petitioner, however, continued to visit Sessomes after Sessomes asked Petitioner to move out. *Id.*

Petitioner visited Sessomes on October 4, 1997 and asked if Sessomes could obtain some crack cocaine for Petitioner to purchase.  *Id.* at 357-59.  Sessomes stated that he was also using crack-cocaine at that time. *Id.* at 359 & 385.  Sessomes stated that Petitioner gave him money to buy the drugs, and after Sessomes made the purchase, he and Petitioner split the crack-cocaine, smoked it, and "got high."  *Id.* at

361-62.  After smoking the initial amount, Sessomes testified that Petitioner gave him more money to buy crack-cocaine and this new quantity of drugs was also smoked.  *Id.* at 362-63.

Sessomes stated that around ten-thirty on the evening of October 4, 1997, Morales called Sessomes and asked if Sessomes would purchase some marijuana for Morales. *Id.* at 364-65.  After Sessomes agreed to get the marijuana, he and Morales began discussing the sale of crack cocaine, and Morales proceeded to show Sessomes some bags of crack-cocaine. *Id.* at 364-67.  Sessomes stated he went back to his apartment, where Petitioner and Regina Allen were waiting. *Id.* at 367.  After a few minutes, Morales came to Sessomes's apartment. *Id.*  Petitioner and Morales discussed Petitioner purchasing drugs from Morales. *Id.* at 367-68.  Petitioner then left to go home and get more money, and Morales went back up to his apartment.  *Id.* at 367-68.

Sessomes testified that after Petitioner left, Sessomes went back up to Morales's apartment and purchased a "rock" of crack cocaine for Ms. Allen. *Id.* at 369.  Sessomes stated that Morales was "alive and well" when Sessomes left Morales's apartment. *Id.*  Approximately one hour later, Sessomes heard Morales' doorbell ring. *Id.* at 370.  Sessomes heard someone come downstairs and open the downstairs door. *Id.* at 371.  Sessomes then heard two sets of footsteps go back upstairs, and a few seconds later, Sessomes heard some scuffling noises. *Id.* at 370-72.  After the scuffling noises, there was quiet for a minute, but Sessomes then stated that he heard someone walking around upstairs as if that person were "moving things." *Id.* at 372.

-6-

Ten or fifteen minutes later, Sessomes again heard Morales's doorbell ring. *Id.* at 373. This time, Sessomes heard Carolyn Harris's voice at the downstairs door, and Sessomes also heard a person coming downstairs from Morales's apartment. *Id.* at 374. The footsteps that Sessomes heard coming down the stairs the second time were heavier than the first set of footsteps. *Id.* At that time, Sessomes heard Petitioner's voice, telling the person at the door that he and Morales could not be disturbed because there was a woman upstairs. *Id.* at 374-75.

Sessomes stated that shortly thereafter, he opened his door and saw Petitioner and Carolyn Harris. *Id.* at 375. Petitioner and Carolyn Harris went into Sessomes's apartment, and Petitioner told Sessomes that he purchased all of Morales' crack-cocaine. *Id.* at 375-76. Petitioner showed Sessomes three or four rocks of crack-cocaine, and Sessomes testified that he recognized Morales's packaging. *Id.* Carolyn Harris then left the apartment. *Id.* at 378. Sessomes stated that Asia Bryant knocked on his window to ask whether Morales was home. *Id.* When Ms. Bryant attempted to go upstairs to see Morales, Petitioner physically restrained her from leaving. *Id.* at 378-79. A small fight ensued between Bryant and Petitioner, and Sessomes had to intervene to stop the fight. *Id.* at 379. After the incident, they all smoked crack-cocaine in Sessomes' apartment. *Id.* at 379-80.

Later, Carolyn Harris knocked on Sessomes' door and asked the occupants if they needed anything from the store. *Id.* at 380. Petitioner requested cigarettes and beer. *Id.* at 380. Sessomes stated that shortly after Ms. Harris returned with the items

from the store, Petitioner and Bryant left the apartment together. *Id.* at 381-82. Sessomes did not know whether Petitioner drank the beer prior to leaving. *Id.* at 396-97. Sessomes stated he left his apartment and when he returned around 2:00 a.m., he saw the police surrounding the apartment building. *Id.* at 382-83.

Asia Bryant also testified for the prosecution. *Id.* at 462-553. She testified that she went to Sessomes's apartment after midnight on October 5, and that Petitioner let her in. *Id.* at 470. She stated that she wanted to go upstairs to Morales's apartment, but that Petitioner prevented her from leaving. *Id.* at 472. She stated that she gave up trying to go upstairs when Petitioner told her that he had "bought out" Morales's crack cocaine and that Petitioner would give Ms. Bryant some of the drugs. *Id.* at 473. Petitioner apologized for pushing Ms. Bryant, and Petitioner and Bryant sat down in the kitchen to smoke the crack cocaine. *Id.* at 475. Ms. Bryant stated that she did not know whether Petitioner had consumed the beer bought by Ms. Harris. *Id.* at 470-78 & 527-28. She further testified that after leaving Sessomes' apartment, she and Petitioner went to her friend, Willie's[2] house where they smoked some more crack-cocaine. *Id.* at 470-86.

During the time that they were at Willie's house, Petitioner called Ms. Bryant into the bathroom with him. *Id.* at 484. While they were in the bathroom, Petitioner told her that he had killed someone, and that the "mob" ordered Petitioner to do so. *Id.* at

---

[2] Although Ms. Bryant never mentioned "Willie's" last name, it appears from the trial transcript that Willie was Willie George Howard, who was also a prosecution witness. (Tr. at 554-77).

485-86.  Ms. Bryant asked Petitioner who he had killed, and when Petitioner stated that it was Ms. Bryant's "friend upstairs," Ms. Bryant assumed that Petitioner meant Morales. *Id.* at 486.  Ms. Bryant testified that Petitioner told her that he had to return to Morales' apartment because he left his wallet there.  *Id.* at 486-87.  Petitioner asked whether Ms. Bryant would go with him and Ms. Bryant agreed. *Id.* at 487.  Bryant stated that she and Petitioner left Willie's apartment. *Id.* at 487.  As they were approaching the apartment building where Morales lived, they saw police cars outside of the building.  *Id.* at 490.

Ms. Bryant stated that when they saw the police, Petitioner stated that they were "not going over there," and he "scooted down in the seat a little bit." *Id.* at 491.  Ms. Bryant testified that shortly after, she got out of the car and began running around because she was "scared." *Id.* at 493.  Ms. Bryant also stated that she wanted to go back to Morales's apartment building, so she asked someone she knew in the neighborhood to accompany her. *Id.*  When she got back to the house, Ms. Bryant stated that she approached an investigator who took her to the police station to make a statement.  *Id.* at 493-94.

Ms. Bryant testified that she was twenty eight years old and had been smoking crack cocaine since she was seventeen. *Id.* at 495.  She described the different "high" that she would get from smoking crack cocaine than she did from drinking alcohol. *Id.* at 495-96.  She stated that crack cocaine would keep her alert and aware of things, while alcohol would make her feel sleepy and sick. *Id.* at 496.

Joseph Servidone, a police officer with the Little Falls Police Department,
testified that in the morning of October 5, 1997, he was on patrol, and he got a call to
go to the Little Falls Hospital because a patient was being "disruptive." *Id.* at 579.  The
name of the patient was Petitioner, Dean Galusha. *Id.* at 579.  When Officer Servidone
arrived at the hospital, Petitioner was standing on the front steps. *Id.*  Officer Servidone
stated that he asked Petitioner what he was doing and why he was "giving the nurses a
hard time."[3] *Id.* at 580.  Officer Servidone stated that Petitioner told him that he had
signed out and wanted to leave. *Id.* at 580.  Officer Servidone stated that he told
Petitioner to go back into the hospital and verify that he had signed out. *Id.* at 581.

As Petitioner was going back into the hospital, Officer Servidone observed that
Petitioner was limping. *Id.* at 581.  Officer Servidone asked Petitioner what happened
to his leg, Petitioner told him that he had been hit by a car in Ilion. *Id.* at 582.  As
Petitioner and Officer Serivdone were walking back into the hospital, Petitioner told
him that he had "killed a nigger in Utica last night."  *Id.* at 582.

Officer Servidone stated that he did not believe Petitioner's statement, but when
Officer Servidone left the hospital, he went back to the police station to see if there had
been any homicides in Utica overnight.  *Id.* at 582-85.  Servidone testified that he
contacted the Utica police and was told to return to the hospital to detain Petitioner.  *Id.*
at 585-86.  Servidone returned to the hospital, found Petitioner, asked him if he was

---

[3] The court notes that Nurse Helene Ellard and Nurse Jean Guiney testified stated they did
not observe any physical signs of intoxication, and did not believe that Petitioner was intoxicated
when he was at the hospital.  Trial Tr. at 681, 695.

willing to go to the police station, and conducted a quick pat frisk. *Id.* at 586-87.
Petitioner was hesitant, but after a brief period, he agreed to be transported to the police
station. *Id.* at 587-88. At the police station, Officer Servidone typed Petitioner's
statement, and then the Utica Police arrived to take Petitioner into their custody. *Id.* at
593.

After the prosecution concluded its case, Petitioner's counsel made a motion to
dismiss the case or in the alternative, counsel asked for a reduction of the charge based
on a lack of evidence. *Id.* at 760-61. The court denied the motion, stating that the
prosecution established a *prima facie* case, and there were questions of fact for the jury
to decide. *Id.* at 761.

When the trial resumed, Petitioner took the stand. *Id.* at 762. Petitioner testified
that after work on October 4, 1997, he went to Sessomes' apartment to obtain some
crack. *Id.* at 762-66. Petitioner stated that gave Sessomes $ 40.00 to purchase the
crack, and that when Sessomes returned, he and Sessomes shared the drugs. *Id.* at 767.
After they finished smoking the drugs, Petitioner stated that he went back home to take
a shower and change his clothes, but that he later returned to Sessomes's house with
two quarts of beer. *Id.* at 767-68. Petitioner stated that his "plan" was for Sessomes to
go back out and purchase some more crack for them to smoke. *Id.* at 768. Petitioner
testified that gave Sessomes another $ 25.00, and they both smoked more crack cocaine
together. *Id.*

Petitioner testified that while he and Sessomes were smoking the crack,

-11-

Petitioner also drank two quarts of beer and became intoxicated.  *Id.* at 770 & 798-99. He stated that smoking crack gave him a "big rush," but that when the initial effect began to wear off, he became paranoid. *Id.*  Petitioner stated that he wanted to purchase more drugs, and asked Sessomes how much it would cost for a larger quantity so that Sessomes would not have to "go back and forth." *Id.* at 771.  Petitioner stated that Sessomes mentioned "his boy upstairs," referring to Morales. *Id.*  Sessomes stated that Morales would give Petitioner a "good deal" for a larger amount of crack. *Id.*  Sessomes then "yelled" to Morales, who came downstairs to discuss the drug deal with Petitioner. *Id.*

Petitioner testified that Morales offered Petitioner six - twenty dollar pieces of crack for $ 100.00, and Petitioner told Morales that he would have to go back home to get the money. *Id.* at 771-72.  Petitioner stated that he did go home to get the money and returned approximately forty five minutes later. *Id.* at 772.  Petitioner then went upstairs to Morales's apartment. *Id.* at 773.  On cross-examination, Petitioner stated that when he went to Morales's apartment, the effects of the crack cocaine had worn off, and he only felt semi-intoxicated from the beer. *Id.* at 798-800.

On direct examination, Petitioner testified that he and Morales began to talk about a woman, but Petitioner became upset about the content of the conversation. *Id.* at 773-74.  Petitioner stated that he became so upset that he told Morales that Petitioner would take his business elsewhere. *Id.* at 774.  Petitioner testified that Morales became angry because he wanted to complete the drug deal, and continued to insist that

-12-

Petitioner give him the money. *Id.* at 774.

Petitioner stated that he "didn't know what to do," so he grabbed Morales in a "bear hug" and they rolled around, both grabbing each other's neck. *Id.* at 774-75 & 813. Petitioner stated that he squeezed Morales' neck and heard a popping noise. *Id* at 775. Petitioner then stated "the next thing you know, he was dead." *Id.* Petitioner also stated that Morales "appeared dead" because there was blood coming from Morales' nose and mouth. *Id.* Petitioner testified that he "freaked out" and began to wonder how he was going to explain Morales's death. *Id.*

Petitioner thought about calling the police but stated that he "just couldn't." *Id.* Instead, Petitioner dragged the body into the closet, grabbed a cord from a radio in the bedroom, and twisted the cord around Morales' neck in an attempt to make it look like a suicide. *Id.* at 775-76. After placing Morales in the closet, Petitioner got a pair of handcuffs from Morales' bedroom, placed them on Morales' wrist, cleaned the blood from Morales' face, cleaned the apartment, and took all of Morales's crack. *Id.* at 776-77. Petitioner testified that he heard the downstairs doorbell ring and left Morales' apartment to answer the downstairs door. *Id.*

Petitioner then testified that he returned to Sessomes' apartment, argued with Ms. Bryant about going upstairs to see Morales, but then left with Bryant. *Id.* at 778-80. Petitioner testified that he and Ms. Bryant went to Willie Howard's house, where they smoked some more crack and where Petitioner told Ms. Bryant that he "accidentally killed her friend." *Id.* at 778-82. Petitioner stated that later that night, he hitchhiked to

Little Falls, but that his leg was hurt badly from the "fight", so Petitioner asked a clerk in a "Nice 'N Easy" store to call an ambulance. *Id.* at 785.  When the ambulance arrived, Petitioner told the medical personnel that he had been hit by a car. *Id.* at 786. Petitioner stated that when he arrived at the hospital, he "started acting like a maniac." *Id.*

On cross-examination, the prosecutor questioned Petitioner extensively regarding his degree of alleged "intoxication" on the night of the murder. *Id.* at 796-802. Petitioner admitted that he was "clear" enough to find his way home when he went back to get the $ 100.00 to purchase the drugs, "clear" enough to count out $ 100.00 and play cards with some  residents of his apartment house when he went home to get the money; and "clear" enough to find his way back to Sessomes's house forty five minutes later. *Id.* at 797.  Petitioner also stated that the crack cocaine had "worn off" by the time that he went back to Sessomes's house, but that he was "semi-intoxicated" from the beer that he drank. *Id.* at 799-800.  Petitioner conceded that he was not under the influence of crack when he was negotiating with Morales in his apartment. *Id.* at 801. Petitioner stated that he was "a little foggy." *Id.*

Petitioner testified that he grabbed Morales because Petitioner was "scared" and he panicked because Morales was "pointing at [Petitioner] in a threatening manner." *Id.* at 807.  Petitioner stated that Morales was taller than Petitioner, was "a drug dealer," and "could have had a gun . . . ." *Id.* The Petitioner then admitted, however, that Morales had no weapon; Petitioner was as tall as Morales; and Petitioner weighed

approximately fifty pounds more than Morales. *Id.* at 807-808.  Petitioner later

described how he strangled Morales, and how although he was "scared," he was not too

scared to spend time trying to make Morales's death look like a suicide. *Id.* 815-18.

Plaintiff later admitted that he told Officer Servidone that Petitioner had "killed some

black guy last night in Utica." *Id.* at 834.  Petitioner was the only defense witness.

After the defense rested, the court discussed whether to charge lesser included

offenses. *Id.* at 840-44.  Petitioner's counsel requested that the court charge

Manslaughter, First Degree as a lesser included offense for the Murder charge, and for

the Depraved Indifference Murder charge, Petitioner's counsel requested a charge of

Manslaughter and Criminally Negligent Homicide. *Id.* at 841.  Defense counsel also

requested a justification charge, and the trial judge agreed to give that charge. *Id.* at

844-45. The jury charge included an instruction stating that although intoxication was

not a defense to a criminal charge, it could be considered in determining whether

Petitioner had the requisite mental state to commit the crime. *Id.* at 932-36.

On April 29, 1998, the jury found Petitioner guilty of murder in the second

degree. *Id.* at 993-94.  Judgment was entered by the Oneida County Court, and Galusha

was sentenced on June 30, 1998.  The Appellate Division, Fourth Department affirmed

on September 28, 2001.  *People v. Galusha*, 286 A.D.2d 933, 731 N.Y.S.2d 414 (4th

Dep't 2001).  Leave to appeal to the Court of Appeals was denied on January 16, 2002.

*People v. Galusha,* 97 N.Y.2d 704, 739 N.Y.S.2d 104, 765 N.E.2d 307 (2002).

Petitioner filed this action on December 30, 2002.  Respondent filed his answer and

memorandum of law in opposition to the petition on March 26, 2003. (Dkt. Nos. 6, 7).

After filing this action, and after Respondent had filed his opposition, Petitioner requested that this court stay consideration of the petition while Petitioner returned to New York State court to exhaust his state court remedies. (Dkt. No. 11). On July 23, 2003, this court granted Petitioner's request. (Dkt. No. 15). On June 10, 2004, this court lifted the stay and afforded Respondent additional time within which to file any additional response to the petition. (Dkt. No. 20). Respondent has chosen to rely on his previously filed opposition papers. (Dkt. No. 21).

## DISCUSSION

### 1.   Standard of Review

According to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant *habeas* relief to a state prisoner claim unless the state courts adjudicated the merits of the claim and such adjudication either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001); *see also Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003). The AEDPA also provides that the "determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1);

*Boyette*, 246 F.3d at 88 (quoting 28 U.S.C. § 2254(e)(1)).

**2.** **Competency**

Petitioner argues that despite the testimony of two psychiatrists at his competency hearing stating that Petitioner was incompetent to stand trial, the trial court erroneously determined that he was competent to proceed. Pet. at ¶ 12(a). The Appellate Division held that the record supported the trial court's determination that Petitioner was competent to stand trial. *People v. Galusha*, 731 N.Y.S.2d at 414. The Appellate Division found that the trial judge was entitled to reject the contrary opinions of the psychiatrists who based their opinions ***solely*** on Petitioner's statement that he could not recall the events that occurred on the night of the murder. *People v. Galusha*, 731 N.Y.S.2d at 414. Because the trial court decided this issue on the merits, the AEDPA standard applies.

A defendant's "constitutional right to due process is violated when a person who is incompetent is convicted of a crime, whether the conviction follows a trial or a plea of guilty." *Harris v. Kuhlmann*, 346 F.3d 330, 349 (2d Cir. 2003)(citing *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996))(additional citations omitted). In order to be competent to stand trial, a defendant should possess the ability to "to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." *Id.* (quoting *Cooper v. Oklahoma*, 517 U.S. at 354).

As stated above, a state court's fact findings are presumed correct, and it is the

petitioner's burden to rebut the presumption by clear and convincing evidence. 28

U.S.C. § 2254(e)(1). *See Harris v. Kuhlmann*, 346 F.3d at 349 (citing *LanFranco v.*

*Murray,* 313 F.3d 112, 117 (2d Cir. 2002)).  Furthermore, determining whether a

defendant is competent to stand trial is within the discretion of the trial court, and that

decision is entitled to deference.  *Davis v. Keane*, 99-CV-71, 2001 U.S. Dist. LEXIS

57, *5-6 (E.D.N.Y. Jan. 4, 2001)(citing, *inter alia*, *United States v. Nichols*, 56 F.3d

403, 414 (2d Cir. 1995); *Francis S. v. Stone*, 221 F.3d 100, 114 (2d Cir.

2000))(additional citations omitted)), *affd*, 45 Fed. Appx. 31 (2d Cir. 2002).  *See also*

*Armstrong v. Duncan*, 2003 U.S. Dist. LEXIS 18266, *24 (S.D.N.Y. Oct. 14,

2003)(citing *Davis, supra*).

     In this case, both psychiatrists stated Petitioner had the ability to consult with his

attorney, make an informed decision based on the advice of counsel, and understand the

charges against him. Competency Hr'g Tr. at A17-18 & B10-13.  Dr. Kotwal testified

that Petitioner understood the process of a trial.  *Id.* at B6-10.  The only reason the

psychiatrists found Petitioner to be incompetent was that he could not remember the

events surrounding the murder.  *Id.* at A24 & B20.  Both psychiatrists stated Petitioner

was nevertheless able to give background information and coherent answers about his

past, was oriented to time and place, and could perceive, relate, and recall incidents of

the past.  *Id.* at A9, A11-13, & B6-10.

     The trial judge made a credibility determination when he commented that

Petitioner either could not remember or "refused" to remember the events of the

murder. *Id.* at B21.  The trial judge asked defense counsel if he believed that he had enough information to proceed with the defense, and defense counsel acknowledged that it was his "honest opinion" that counsel could go forward with the trial. *Id.* at B23. Based on the testimony, and his credibility determination, the trial judge found Petitioner competent to stand trial.

The trial court's findings of fact on the issue of competency are presumed to be correct, and that determination is entitled to deference.  Petitioner has failed to rebut the presumption by clear and convincing evidence.  In fact, a review of Petitioner's trial testimony shows that he had quite a vivid memory of the exact details of the incident. *See e.g.* Trial Tr. at 771-77.  Petitioner testified exactly as to what he did the night of the murder, even remembering that he and Morales had an argument about a woman that started the entire chain of events. *Id.* at 773-74.  Petitioner clearly testified about the fight, about hearing Morales's neck making a "popping" noise and thinking that Morales "appeared dead." *Id.* at 775.  Petitioner stated that he "freaked out" and wondered how he was going to "explain" the death. *Id.*  Finally, Petitioner clearly testified how he tried to make the incident look like a suicide. *Id.* at 775-76.  This was the testimony of an individual who remembered many details of the incident and who could help his attorney defend the case.  Thus, the Appellate Division's finding that the record supported the trial court's determination of competency was not contrary to, or an unreasonable application of, clearly established federal law.

Therefore, Petitioner's first ground may be ***denied and dismissed***.

### 3.    Sufficiency of the Evidence

Petitioner asserts that based on the evidence presented, the prosecution did not prove that Petitioner acted with the intent to kill Mr. Morales, and thus, the evidence was insufficient to convict him of second degree murder.  Pet. at ¶ 12(b).  Petitioner raised this issue on appeal, but the Appellate Division held that Petitioner "**failed to preserve this issue for review.**" *People v. Galusha*, 731 N.Y.S.2d at 415 (emphasis added).  After filing his habeas corpus petition in this court, Petitioner apparently believed that this issue was "unexhausted" and returned to state court to raise the sufficiency of evidence issue again in his N.Y. CRIM. PROC. LAW § 440.10 motion.[4]

The trial court denied the section 440.10 motion, stating that the issue had already been decided by the Appellate Division.  Because the last state court to consider the sufficiency of the evidence claim explicitly relied upon the Appellate Division's finding that Petitioner failed to preserve this issue, this court must base its analysis on that finding. *See e.g. Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005)(citation omitted)(procedural default applies when the last state court rendering a judgment clearly and expressly states that its judgment rests on a procedural bar).

A federal habeas court "generally will not consider a federal issue in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and *adequate* to support the judgment.'" *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007)(quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002))(emphasis added).

---

[4] Dkt. No. 19, Galusha Aff., dated April 27, 2004, Ex. Motion to Vacate, dated Dec. 13, 2002.

This rule applies whether the independent state law ground is substantive or procedural. *Id.* One state law ground often asserted as an independent and adequate state law basis for denying a federal claim is a state law procedural default. *Edwards v.* Carpenter, 529 U.S. 446, 455 (2000)(Breyer, J. and Stevens, J. concurring).

There are certain situations in which the state law ground will not be considered "adequate." *Edwards*, 529 U.S. at 455. The circumstances in which the state law ground will not bar federal habeas review are (1) where the failure to consider the claim will result in a miscarriage of justice; (2) where the state procedural rule was not firmly established and regularly followed; and (3) where the petitioner had "cause" for not following the procedural rule and suffered "prejudice as a result." *Id.* (citing *inter alia Coleman v. Thompson*, 501 U.S. 722, 750 (1991)(discussing miscarriage of justice); *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)(discussing the concept of "firmly established" and "regularly followed"); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)(cause and prejudice standard).

### A. Firmly Established and Regularly Followed

In *Garvey v. Duncan*, Second Circuit has recently considered the rule that the state law ground is only ***adequate*** to support the decision and prevent review of the federal claim if the state law ground is "'firmly established and regularly followed.'" *Garvey v. Duncan*, 485 F.3d at 713 (quoting *Lee v. Kemna*, 534 U.S. at 376). The Second Circuit stated that in certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that

rule in a particular case would be considered "exorbitant." *Id.*

In this case, the Appellate Division found that Petitioner did not "preserve" his sufficiency of evidence claim. Although this is considered a procedural default in state court, this court must consider whether that procedural default was "adequate" to support the Appellate Division's finding and whether the Appellate Division applied the procedural rule in an "exorbitant" manner.

Under New York law, there are two ways to preserve a question of law for appeal. *Garvey*, 485 F.3d at 714. The first method is through an objection at trial by a party who later claims error. *Id.* (citing N.Y. CRIM. PROC. LAW § 470.05(2)). The second way to preserve an issue for appeal is for the trial court to make an express ruling regarding a particular issue.[5] *Id.* The court in *Garvey* discussed the kind of protest or objection at trial that would be adequate to preserve a particular claim. *Id.* at 714-15. The court in *Garvey* cited New York law for the proposition that in order to preserve an issue for appeal, the defendant must "specifically focus on the alleged error." *Id.* (citing *People v. Gray*, 86 N.Y.2d 10, 19, 629 N.Y.S.2s 173, 174, 652 N.E.2d 919, 921 (1995)). A general objection is insufficient because it will not alert the court to the defendant's position. *Id.* (citing *People v. Gray*, 86 N.Y.2d at 20).

Among the cased cited by the Second Circuit in *Garvey* was *People v. Parsons*, 30 A.D.2d 1071, 816 N.Y.S.2d 271 (4th Dep't 2006). In *Parsons*, the Appellate

---

[5] This court is not considering this method of preserving the issue because in Petitioner's case, his trial counsel did move to dismiss at the end of the prosecution's case based upon the sufficiency of the evidence. The only ruling made by the trial judge regarding this issue was in response to that motion.

Division specifically held that the defendant had failed to preserve his insufficiency of evidence claim because the motion to dismiss was not specifically directed at the alleged insufficiency. *Id.* The *Garvey* court stated that New York courts consistently interpret N.Y. CRIM. PROC. LAW § 470.05(2) as requiring that a defendant specify the grounds of the alleged error in sufficient detail so that the trial court may have the opportunity to correct any error. *Garvey*, 485 F.3d at 715 (citing *People v. McLane*, 256 A.D.2d 10, 682 N.Y.S.2d 24, 25 (1st Dep't 1998)).

In this case, at the close of the prosecution's evidence, Petitioner's trial counsel moved "for a dismissal or a reduction in charge based upon a lack of evidence brought forth by the People in this case." Trial Tr. at 760. This was a general motion based on the insufficiency of evidence. On appeal, Petitioner's counsel argued that the prosecution had failed to prove that Petitioner had the "conscious objective" to cause the victim's death, considering his alleged intoxication and justification defense." Petitioner's Appellate Brief at 5-7. Petitioner's counsel acknowledged that he was not making the same argument made by trial counsel in his motion to dismiss. *Id.* at 5. Petitioner's appellate counsel specifically argued to the Appellate Division that the issue was not the absence of an objection by trial counsel, but the sufficiency of that objection. *Id.* He then asked the Appellate Division to consider the merits of the sufficiency of evidence claim, notwithstanding the insufficiency of trial counsel's motion. *Id.*

In its decision, the Appellate Division cited *People v. Gray, supra* in holding that

-23-

Petitioner failed to preserve his insufficiency of evidence claim. *People v. Galusha*, 286 A.D.2d at 415.  Based on *Garvey* and the New York cases cited by the Second Circuit in *Garvey*, it is clear that the Appellate Division in this Petitioner's case utilized a firmly established and regularly followed procedural basis for denying Petitioner's sufficiency of evidence claim.  Basically the Appellate Division in this case found that although Petitioner did move to dismiss based on insufficient evidence at the close of the prosecution's case, he did ***not*** specify the particular insufficiency that he later attempted to raise in the Appellate Division, and therefore, the issue was "unpreserved."

As stated above, even a firmly established and regularly followed rule will not prevent habeas review if the application of that rule was "exorbitant." *Garvey*, 485 F.3d at 713-14.  In determining whether the application of an independent state rule was "exorbitant," the court should consider (1) whether the alleged procedural violation was actually relied upon by the trial court and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law required compliance with the rule in the specific circumstances, and (3) whether petitioner had "substantially complied" with the rule given the "realities of trial" and whether demanding perfect compliance with the rule would serve a legitimate governmental interest. *Id*. at 714 (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003)).  These factors are not all determinative, but are a guide to evaluate the state's interest in a particular rule in the circumstances of a particular case. *Id.* at 714.

A review of the relevant factors in the above list shows that in this case, the Appellate Division's application of the procedural rule was not exorbitant.  Although the beginning of the first factor is not applicable because the procedural default was raised in the Appellate Division, had Petitioner in this case complied with the state rule, the trial court would have had the opportunity to consider the sufficiency of the evidence in conjunction with Petitioner's claim of intoxication and justification. Second, as cited above, and as cited in *Garvey*, New York case law has required the use of this rule in the specific circumstances. *See e.g. People v. Parsons, supra.  See also Green v. Travis*, 414 F.3d at 294-95 (citing *People v. Rodriguez*, 262 A.D.2d 428, 428, 693 N.Y.S.2d 54 (2d Dep't 1999)).

Finally, requiring a defendant to specifically cite the basis for his objection serves the legitimate governmental interest of allowing the trial court to have the first opportunity to correct any alleged legal error.  Based on the appropriate factors, the application of the state rule by the Appellate Division was not "exorbitant."  Thus, Petitioner's cannot claim relief from his procedural default based upon the exception that the procedural rule was not firmly established and regularly followed.

## B.  Cause, Prejudice and Fundamental Miscarriage of Justice

If a procedural default has occurred, Petitioner may obtain review of the defaulted claim if he can show cause for his default and prejudice resulting from the error. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Ramirez v. Attorney General of New York*, 280 F.3d 87, 94 (2d Cir. 2001).  Finally, Petitioner may obtain review of his

defaulted claim if he can show that the failure to review the claim will result in a fundamental miscarriage of justice. *Coleman, supra.* This final exception, however, is intended for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *See also Lebron v. Mann*, 40 F.3d 561, 564 (2d Cir. 1994).

To establish cause for his procedural default, Petitioner must show that some objective external factor impeded his ability to comply with New York's procedural rules. *Murray v. Carrier*, 477 U.S. at 488; *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999). Examples of external factors include interference by officials, ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or on direct appeal. *Murray v. Carrier*, 477 U.S. at 488. Attorney ignorance or inadvertence does not rise to the level of "cause," but attorney error rising to the level of constitutional ineffectiveness will rise to the level of "cause." *Edwards v. Carpenter*, 529 U.S. at 451.

Petitioner in this case has not demonstrated cause for his procedural default. Although Petitioner has an ineffective assistance of trial counsel claim in this petition, he has only raised counsel's ineffectiveness regarding his alleged failure to request an intoxication charge and his alleged failure to properly raise Petitioner's psychiatric problems. There is no mention of the alleged failure to properly move to dismiss based on insufficiency of evidence. In order for Petitioner to claim ineffective assistance of trial counsel as cause for his procedural default, he would have to have separately

exhausted ineffective assistance of counsel as an independent claim. *Edwards v. Carpenter*, 529 U.S. at 451-52.

The court would point out that if Petitioner returned to state court in an attempt to raise the separate ineffective assistance of counsel claim, that claim would be rejected by the state court as procedurally defaulted.  Petitioner has already raised one aspect of his ineffective assistance of counsel claim on appeal, and the Appellate Division decided that claim on the merits.  Any attempt to raise the ineffective assistance of counsel claim in a motion to vacate the conviction under N.Y. CRIM. PROC. LAW § 440.10 in the trial court would be met with a finding that Petitioner should have raised the claim on appeal because sufficient facts existed on the record to raise the issue before the Appellate Division. N.Y. CRIM. PROC. LAW § 440.10(2)(c). This would amount to another procedural default. *See Williams v. Artus*, 05-CV-2479, 2006 U.S. Dist. LEXIS 90051, *21-22 (E.D.N.Y. Dec. 13, 2006)(discussing the trial court's invocation of section 440.10(2)(c) as a procedural default).

Because Petitioner has not demonstrated cause for his procedural default, the court need not decide whether he has suffered prejudice as the result.  Federal habeas relief is unavailable for a procedurally defaulted claim unless ***both*** cause and prejudice are established.  *See e.g. Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Pou v. Keane*, 977 F. Supp. 577, 581 (N.D.N.Y.  1997).

Finally, Petitioner has not shown that the failure to review his claim of sufficiency of the evidence would result in a miscarriage of justice or that he is actually

innocent of the crime.  In view of all the evidence and Petitioner's admissions, Petitioner cannot claim that he was "actually innocent."  Petitioner admitted on the witness stand that he had an argument with Morales, that he squeezed Morales's neck, that he heard his neck "popping," and that he went to great lengths to cover up the crime and make it look as if Morales committed suicide.  There can be no claim of actual innocence based upon the evidence in this record.  Thus, Petitioner's claim of insufficiency of evidence is procedurally barred, and this claim may be ***denied and dismissed***.

**4.**   **Jury Charge**

Petitioner alleges that the trial court erred by failing to charge the jury regarding intoxication and extreme emotional disturbance.  Pet. at ¶ 12(c).  The Appellate Division specifically stated that Petitioner failed to preserve this issue for review. *People v. Galusha*, 731 N.Y.S.2d at 415.

As stated above, "the failure to preserve an issue as required by state law results in a procedural default."  *Franco v. Walsh*, 2002 WL 596355, at *6 (S.D.N.Y. Apr. 17, 2002) (citing *Jones v. Vacco*, 126 F.3d 408, 414-15 (2d Cir. 1997)).  Petitioner must, thus, attempt to demonstrate cause for his default and resulting prejudice, or present evidence to show that he is "actually innocent" of the crime of which he was found guilty.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Petitioner has again failed to demonstrate cause for his procedural default regarding this claim.  Because he cannot establish cause, this Court need not decide whether he also suffered actual prejudice.

*See, e.g.*, *Stepney v. Lopes, supra.*  As stated above, Petitioner has also failed to establish that he is actually innocent.  Thus, Petitioner's third ground may be ***denied and dismissed***.[6]

## 5.   Ineffective Assistance of Counsel

Petitioner claims that his counsel was ineffective because "[n]o defense was offered with regard to the psychiatric problems of petitioner, nor was an intoxication charge sought."  Pet. at ¶ 12(d).  The Appellate Division held on the merits that Petitioner was not denied effective assistance of counsel.  *People v. Galusha*, 731 N.Y.S.2d at 415.

Because the Appellate Division decided the counsel issue on the merits, this court may proceed to consider the merits of the issue pursuant to the AEDPA standard. The well-established Supreme Court precedent provides that to establish ineffective assistance of counsel, a habeas petitioner must show 1) that counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and 2) that there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Bell v. Cone*, 535 U.S. 685, 695 (2002)(citing *Strickland v. Washington*, 466 U.S. at 688 & 694); *see also Aeid v. Bennett*, 296 F.3d 58, 62-63 (2d Cir. 2002); *Brown v. Artuz*, 124 F.3d 73, 79-80 (2d Cir. 1997); *Rattray v. Brown*, 261 F. Supp. 2d 149, 157

---

[6] The Courts notes that in any event, the issue of intoxication was presented to the jury, and Petitioner would not have been able to establish an extreme emotional disturbance defense.

(E.D.N.Y. 2003).[7]

An attorney's conduct is not considered to be objectively unreasonable if the
challenged actions or omissions "might be considered sound trial strategy." *Strickland
v. Washington*, 466 U.S. at 689; *see also Loliscio v. Goord*, 263 F.3d 178, 192 (2d Cir.
2001)(citing *Strickland*).   Additionally, when measuring counsel's representation, the
"court must indulge a strong presumption that counsel's conduct falls within the wide
range of reasonable professional assistance[,]" bearing in mind that "[t]here are
countless ways to provide effective assistance of counsel in any given case[]" and that
"[e]ven the best criminal defense attorneys would not defend a particular client in the
same way." *Strickland v. Washington*, 466 U.S. at 689, *quoted in United States v.
Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990).

In this case, the court **did** instruct the jury regarding intoxication in describing
the lesser included offenses. *See* Trial Tr. at 932-36.  Thus, Petitioner's assertion that
his counsel was ineffective because he ***failed to offer*** a defense with regard to
Petitioner's possible intoxication is without merit, and counsel's representation did not
fall below an objective standard of reasonableness.  As to the "sufficiency" of the
defense, there was a great deal of testimony regarding the amount of drugs and alcohol
that Petitioner ingested on the night of the crime.  Petitioner apparently claims that
defense counsel did not focus enough on the Petitioner's degree of intoxication,
however, there was no evidence, other than the testimony that had already been given

---

[7] In *Williams v. Taylor*, the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly
established Federal law[.]'"  529 U.S. 362, 391 (2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001).

of the degree of Petitioner's alleged intoxication.  In addition, Nurses Ellard and

Guiney **both** testified that there was no evidence that Petitioner was intoxicated when

he was at the hospital after the incident.  Trial Tr. 691, 695.  Petitioner does not indicate

what other evidence counsel could have produced that would have established a

defense of intoxication.  Petitioner **himself** testified on cross-examination that the

effects of the crack had worn off by the time he was negotiating with Morales and that

Petitioner was only "semi-intoxicated" from the beer.  Trial Tr. at 799-801.

An extreme emotional disturbance affirmative defense could reduce a charge of

murder in the second degree to manslaughter in the first degree.  *Roche v. Burge*, 2006

WL 234997, at *3 (S.D.N.Y. Feb. 1, 2006) (citing *People v. Casassa*, 404 N.E.2d 1310,

*cert. denied*, 449 U.S. 842, (1980)) (further citations omitted).  In order to warrant such

a defense, petitioner must show, by a preponderance of the evidence, that: 1) the person

was killed "not out of anger, but rather, while under the influence of an 'extreme'

emotional disturbance -- a 'loss of self control' so 'excessive and violent in its effect'

that the defendant was actually suffering from a mental infirmity, albeit one not arising

to the level of insanity[;]" and 2) "there was an objectively reasonable explanation or

excuse for the disturbance."  *Id.* (citations omitted).

In this case, this issue was discussed prior to submitting the case to the jury and

defense counsel stated that the affirmative defense of extreme emotional disturbance

would not be raised.  Trial Tr. at 850-51.  It could have been legitimate trial strategy to

refrain from asking for such a charge in light of the fact that the justification charge was

submitted and because there was very little, if any, credible evidence presented at trial to support such an affirmative defense.

Counsel's representation did not fall below an objective standard of reasonableness, and Petitioner was not prejudiced.  The jury was aware of Petitioner's drug use and consumption of alcohol as well as his mental and physical states after he had consumed those substances.  There is no reasonable probability that the outcome of the trial would have been different.  The jury was charged regarding lesser included offenses, including manslaughter in the first degree.  The jury concluded that the lesser included offenses were not applicable in this case.  *Id.* at 938-92.  Petitioner has not shown how his psychiatric history would have been relevant to the claim of extreme emotional disturbance.  Thus, the Appellate Division's decision was not contrary to, or an unreasonable application of, clearly established federal law.

Thus, petitioner's fourth claim may be ***denied and dismissed***..

## 6.   <u>Harsh and Excessive Sentence</u>

Petitioner argues that his sentence is unduly harsh and excessive because the trial court failed to consider his psychiatric problems and therefore abused its discretion.  Pet. at ¶ 12(e).  The Appellate Division held on the merits that Petitioner's sentence was neither unduly harsh nor severe.  *People v. Galusha*, 731 N.Y.S.2d at 415.

The Eighth Amendment of the United States Constitution prevents punishment that is grossly disproportionate to the crime. *United States v. Bonnett*, 769 F.2d 68, 71 (2d Cir. 1985); *United States v. 38 Whalers Cove Drive, Babylon, N.Y.*, 954 F.2d 29, 38

(2d Cir. 1991)(citing *Solem v. Helm*, 463 U.S. 277, 290-92 (1983)); *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citation omitted).  In determining the constitutionality of a sentence pursuant to the Eighth Amendment, a court must assess the sentence on three factors: 1) "the gravity of the offense and the harshness of the penalty;" 2) "the sentences imposed on other criminals in the same jurisdiction;" and 3) "the sentences imposed for commission of the same crime in other jurisdictions." *United States v. Bennett*, 252 F.3d 559, 567 (2d Cir. 2001) (citing *Helm*, 463 U.S. at 292); *see also 38 Whalers Cove Drive, Babylon, N.Y.*, 954 F.2d at 38.

Considerable deference is granted to "legislatively mandated terms of imprisonment," and "'successful challenges to the proportionality of particular sentences' will be 'exceedingly rare.'" *Hutto v. Davis*, 454 U.S. 370, 374 (1982) (citation omitted).  The Second Circuit has stated that "no federal constitutional question is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted); *see also Thompson v. Lord*, 2002 WL 31678312, at *8 (N.D.N.Y. Nov. 8, 2002).

Murder in the second degree is a class A-I felony, and the minimum term of imprisonment "shall not be less than fifteen years nor more than twenty-five years[.]" N.Y. PENAL LAW §§ 125.25 & 70.00(3)(a)(i).  The maximum term of imprisonment for a class A felony "shall be life imprisonment." *Id.* § 70.00(2)(a).  The sentence imposed by the court in this case for the second degree murder conviction under N.Y. PENAL LAW § 125.25(1) was an indeterminate term of twenty-two years to life, which was

clearly within the range provided by the New York State statute.  Therefore, no federal

constitutional question is presented, and the Appellate Division's determination was not

contrary to, or an unreasonable application of, clearly established federal law.

Thus, petitioner's fifth claim may be **_denied and dismissed_**.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Petition be **DENIED** and **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to

file written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**(10) DAYS WILL PRECLUDE APPELLATE REVIEW.**  _Roldan v. Racette_, 984

F.2d 85, 89 (2d Cir. 1993) (citing _Small v. Sec'y of Health and Human Servs._, 892 F.2d

15 (2d Cir. 1989)); _see also_ 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date: August 6, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge